[Civ. No. 21776. Second Dist., Div. Three. Dec. 26, 1956.]

JULIA JONES et al., Appellants, v. W. S. HOTCHKISS
et al., Respondents.

S. M. Dana for Appellants.

Crider, Tilson & Ruppe and Jerome M. Budinger for Respondents.

VALLÉE, J.—Appeal by plaintiffs from a judgment of nonsuit in an action for damages for personal injuries sustained by plaintiff Julia Jones when she slipped and fell on the floor of the service porch in defendants' residence.

The complaint alleged that plaintiff Julia Jones was employed by defendants as a day houseworker on their premises; defendants "placed and permitted to remain thereupon sawdust and/or other foreign substances which maintained a dangerous condition" on the premises; as a proximate result plaintiff slipped and fell while in the performance of her duties.

It appears to be conceded that Julia Jones was an invitee of defendants and that they were under a duty to exercise ordinary care to maintain the floor of the service porch in a reasonably safe condition.

Plaintiff Julia Jones was employed intermittently by defendants from 1949 to September 21, 1953. On direct, she testified: She worked four days a week for defendants. On September 21, 1953, she was doing cleaning and laundry work. "Q. Before the accident occurred on the service porch, did you have any other occasion to go to the service porch? A. No, sir, no, sir. . . . Q. Will you tell us, please, how you got onto the service porch that day? A. Well, after I finished all in the house, I came on out, on through the kitchen, out on the service porch, picked up the trash cans to take them on out to the incinerator. . . . Q. Did you have anything in your hands? A. Not when I went on out, no, sir. Q. When did you take the cans in your hands? A. After I got out on the service porch I picked up the trash cans. Q. You picked up the trash cans and you went out to the back? A. Yes, sir. . . . Q. Did you take the trash to the back? A. Yes sir. Q. In going to the back, were you on any particular pavement or concrete or stones or were you on grass or what were you actually walking on to go from the service porch to the incinerator? A. When you come off the service porch

it is concrete. They have little concrete steps to go down, then you are on gravel to the incinerator. Q. Did you empty the wastebaskets in the incinerator? A. Yes, sir. Q. Did you return to the service porch? A. Yes, sir. . . . Q. As you were walking into the service porch, did something happen? A. Yes, sir. Q. Tell me there what happened. A. Well, my left feet [sic] slipped out from under me. Q. Go ahead. A. And I fell. My left feet [sic] skid out from under me and I fell, fell back. Q. When you fell, did you fall onto the ground? A. Yes, onto the floor. . . . Q. . . . . Now, after you fell did you notice the ground—the floor on which you fell? A. No, sir, I didn't pay any attention, much attention to the floor. Q. You didn't pay any attention to the floor itself? A. No, sir. Q. Did you notice anything on your clothes that apparently came from the floor? A. Yes, sir, after I had gotten up and gotten—they taken me, I notice that little fine stuff was on my uniform. Q. What do you mean? A. Little fine sawdust that come from the machine of Mr. Hotchkiss', little fine stuff. Q. You say that was on your uniform? A. Yes, sir. Q. What portions of your uniform did you notice this on? A. This little part here, this big part is where I noticed it (indicating). Q. Did you notice anything at all on the floor, such as mud, sticks, stones, anything like that? A. No, sir. . . . Q. Incidentally, after the accident happened, Mr. Hotchkiss and Mrs. Hotchkiss were both in the house? A. Yes, sir. Q. Was there anything said about the accident or the service porch or the sawdust after the accident happened? A. Well, Mrs. Hotchkiss mentioned once that—said that she was going to have Mr. Hotchkiss move his machine in the garage because that sawdust kept the floor slippery and somebody was going to get hurt.''

On cross, plaintiff Julia Jones testified that in going through the service porch on her way to the incinerator she did not look at or pay any attention to the floor. ''Q. How about coming back in before you had your fall, let's take it just as you are about to step into the door, go back onto the service porch, did you look to see if there was anything on the floor in front of you? A. No, sir, I didn't even look there, I didn't even pay any attention to the floor, I had the pail in my hand. Q. How many steps would you say you took from the time you entered the door until you had your fall? A. I would say I took about three—about three steps, I would say. Q. And were you going back the same way that you had come out? A. Yes, sir. Q. You were going back

over the same path that you used before? A. Yes, sir, I was going back toward the kitchen. Q. On the time that you were walking out with the baskets had you slipped? A. Did I slip? Q. When you were walking out with the baskets did you slip? A. No, sir. . . . Q. Did you notice anything unusual at all about the floor as you walked out with the baskets? A. No, sir. Q. It didn't feel slippery, did it? A. I wasn't paying any attention, I didn't pay any attention, I just wasn't paying any attention to the floor. Q. Then as you took those first three steps before you had your fall, you didn't notice anything unusual about the floor, during those three steps, did you? A. No, sir. Q. And you never did either before or after the accident see anything on the floor itself, did you? A. Well, no, sir, I didn't, no, sir. In fact, I didn't look and after I had the accident I was hurting so I didn't pay any attention to the floor.''

Defendant Margareta W. Hotchkiss, called by plaintiffs, testified Julia was employed as a cleaning maid; there was a ''Delta'' power tool on the service porch; her husband used it primarily on holidays and nights after work; ''Q. Did this Delta power tool give off any debris, sawdust, shavings or the like? A. When in use, yes, sir. Q. Did it give off sawdust? A. Depending on the type of work being done, yes, sir. Q. If he were sawing wood, would it give off sawdust? A. I believe so. Q. Had you observed sawdust on the floor of the service porch when he was working? A. Yes, sir. . . . Q. Now, there were occasions before September 21, '53, when this Delta tool was used, were there not? A. Yes.''

Defendant W. S. Hotchkiss, called by plaintiffs, testified he was at home at the time of the accident; ''Q. Did you help Mrs. Jones to her feet? A. Yes. Q. After you helped her to her feet, did you notice any mud or debris or pebbles or anything of that sort on the floor? A. No. Q. As you walked out the service porch to the incinerator is there a pathway of some sort to walk on? A. No, there is no path; there is concrete slab which abuts on the outside of the door. Q. Would you be walking on any mud or grass or oil as you went out to the incinerator and returned? A. No. Q. On the service porch there was a mechanical—that's a bad word—there is a kind of a work bench? A. Yes. Q. Besides that work bench you had some other tools there? A. Yes. Q. And you had a so-called Delta tool? A. Yes. Q. And this Delta tool, among other things, I gather it shaves and cuts wood? A. Yes. Q. Before September 21, '53, you had occasion to use the

tool? A. Yes. Q. Did anyone besides yourself use it? A. No. . . . Q. . . . How did the tool get onto the service porch? A. I put it on the service porch. Q. Did you place it yourself or did you have someone else do it for you? A. It was movable and I moved it. Q. You moved it and placed it there? A. Yes. Q. Now, when this tool is being used for certain types of work will it create sawdust? A. Yes. Q. Have you·observed this sawdust on the floor of the service porch? A. Yes. Q. I am talking about before September 21st about the operation of the tool and the sawdust on the floor. I am going to ask you something subsequently but right now I am addressing myself to the period subsequent to September of 1953. This is an asphalt tile floor, is it not? A. That's what I understand. . . . Q. Had this service porch been waxed before the time of the accident? A. I never saw it waxed. Q. Well, to your knowledge had you observed if it had been waxed or was in a waxed condition? A. I am not sure that I could tell that. I don't believe I could determine without close and careful examination whether or not it had been waxed. . . . Q. I would like to refer you to Page 14 [of deposition], commencing at Line 13 to Line 17—I beg your pardon—starting at Line 10, where the question is, to Line 17. There was a question asked of you at this time, November 9, '55, when your deposition was taken : ' Question : Did you ordinarily mop the floor or did you use something else, in the main, did you wax it or anything like that? Answer : Yes, it is waxed. You have to preserve the surface and you also mop it and clean it. Question : Before September 21, 1953, do you know when it was last waxed? Answer : No, I don't know.' Does this refresh your memory as far as the fact that it had been waxed before September of 1953? A. I believe I answered that I had never seen it waxed but I think it had been waxed at some time prior to that. Q. Now, you customarily used this tool in the evening after you came home from work? And I don't mean every evening but if you would use it, it would be after working hours? A. Nonworking hours. Q. Ordinarily what time do you get home? A. 6 :00, 6 :30. Q. And do you use the tool on holidays when you are not working? A. On occasion. Q. After you use the tool you always, when you finish, clean up, do you not? A. Yes. Q. And usually you would clean up the same evening you used the tool? . . . Q. Gather up any shavings? . . . A. Yes.''

The foregoing evidence constituted plaintiffs' case. It is hardly necessary to say that if inferences can reasonably

and fairly be deduced from the evidence which sustain the allegations of the complaint, it is error to grant a motion for a judgment of nonsuit. ■ Negligence may be established by circumstantial evidence, which is nothing more than one or more inferences which may be said to arise reasonably from a series of proven facts. ■ A plaintiff relying on circumstantial evidence does not have to exclude the possibility of every other reasonable inference possibly deriving from the evidence. (*Sanders* v. *MacFarlane's Candies*, 119 Cal.App. 2d 497, 500 [259 P.2d 1010].) ■ It is reasonable to infer that the asphalt tile floor was slippery—Julia's foot skidded out from under her and she "fell back"; that the floor had been waxed; that there was "fine sawdust" on the floor which came from the power tool; that defendants knew or should have known of the condition—Mrs. Hotchkiss said she was going to have the machine moved "because that sawdust kept the floor slippery and somebody was going to get hurt." (*Hatfield* v. *Levy Brothers*, 18 Cal.2d 798, 805 [117 P.2d 841].)

■ No inference of negligence arises from the mere fact of the fall or from the mere fact the floor was slippery in the absence of proof of some foreign substance on the floor or proof of a dangerous condition created by or known to the defendant. (*Harpke* v. *Lankershim Estates*, 103 Cal.App.2d 143, 145-146 [229 P.2d 103].) ■ To impose liability on the owner it must be shown that a dangerous condition existed, and that the defendant knew or should have known of it. ■ While under some circumstances negligence may be inferred from the existence of a dangerous condition, the burden rests on the plaintiff to show the existence of a dangerous condition and that the defendant knew or should have known of it. (*Vaughn* v. *Montgomery Ward & Co.*, 95 Cal.App.2d 553, 556 [213 P.2d 417], and cases there cited.)

■ It is not negligence *per se* to have a waxed floor in a home, but a floor may be so waxed as to make it slippery and dangerous, particularly with sawdust upon it. (*Henderson* v. *Progressive etc. System*, 57 Cal.App.2d 180, 185 [134 P.2d 807].) *Tuttle* v. *Crawford*, 8 Cal.2d 126 [63 P.2d 1128], was a case where a woman stepped on a wet space of cement floor in a store, slipped and fell, and was injured. The wet spot was caused by the act of the employees of the store in freshening heads of lettuce by immersing them in water. The court held that whether the floor of the store was so negligently maintained as to render the person responsible for its condition

liable in damages, was a question of fact to be decided by the jury. Many cases are there cited dealing with injuries resulting from falls caused by feet slipping on account of oil or grease or other substances which sometimes become deposited on floor spaces, or injuries inflicted because of improper floor conditions; and in each case they are held to be properly referable to juries for decision.

In *Sharpless* v. *Pantages*, 178 Cal. 122 [172 P. 384], the plaintiff fell in the defendant's theatre due to the laying of a carpet in a loose condition. It was there held that since it was the defendant's act that was complained of as creating a dangerous floor condition, notice was not involved, and it was only necessary for plaintiff to show that the defendant's act had created a dangerous floor condition causing the plaintiff's injury. The plaintiff proved that her foot slipped as she stepped upon the carpet. The defendant moved for a nonsuit. The motion was denied by the trial court. Affirming, the Supreme Court said: "the fact that the plaintiff's foot slipped as she stepped upon the carpet is some evidence tending to show that defendant had failed" to use ordinary care to maintain the carpet upon the steps in such condition that it would be safe for persons to pass thereon in an ordinary manner, "and it is sufficient to sustain the decision upon the motion for a nonsuit."

In *Nicola* v. *Pacific Gas & Elec. Co.*, 50 Cal.App.2d 612 [123 P.2d 529], this court observed (p. 615):

"Appellants' argument goes further to assail the finding that the floor was maintained by defendants in a negligent manner, and they rely upon a rule, which has been followed by some courts in other jurisdictions, that the duty of an owner to exercise ordinary care is not violated by merely oiling or waxing and polishing a floor in the usual way although the floor is rendered slippery thereby. [Citations.] This is contrary to the settled law as announced by our own courts.

"In *Rothschild* v. *Fourth & Market St. R. Co.* (1934), 139 Cal.App. 625, 628 [34 P.2d 734], it was held that evidence that a floor of a hallway maintained by the owner of a building, for use by invitees of tenants of the building had been rendered slippery by the application of wax was sufficient to support a finding of negligence. This decision was in accord with those in [citations]. The right of a proprietor of a place of business to wax a floor which the customers are expected to use is not one which upon any reasonable theory

can be held to be superior to his duty to use ordinary prudence and caution to avoid injury to those who come to his premises by invitation. If wax or, as in the present case, both wax and soft soap, are applied to the floor, it must be in such manner as to afford reasonably safe conditions for the proprietor's invitees, and if such compounds cannot be used on a particular type of floor material without violation of the duty to exercise ordinary care for the safety of invitees, by reason of the dangerous conditions they create, they should not be used at all. Of course slipperiness is an elastic term. From the fact that a floor is slippery it does not necessarily result that it is dangerous to walk upon. It is the degree of slipperiness that determines whether the condition is reasonably safe. This is a question of fact."[1]

The jury could have reasonably inferred from the evidence that the surface of the floor of the service porch was sufficiently hard and smooth to become unsafe with the application of wax, or from the application of wax with sawdust upon it. It was for the jury to determine whether the condition was one of reasonable safety or, in other words, whether defendants had exercised ordinary care with respect to the condition of the floor.

In the light in which the evidence must be viewed on a motion for a judgment of nonsuit, the motion was improperly granted.

Reversed.

Wood (Parker), J., concurred.

SHINN, P. J.—I concur; but feel impelled to add a thought which comes to mind more often than it is expressed. I put it in the form of questions. Why do defense lawyers press for nonsuits when practically all the material facts are in evidence, instead of submitting the case on the merits, and why do trial judges grant nonsuits in doubtful cases when they are convinced that a verdict in favor of the plaintiff would be against the weight of the evidence and that it would be their duty to grant a new trial? It should be clear from a study of the reported cases that the rule applicable to non-

---

[1] Also see *Williamson* v. *Hardy*, 47 Cal.App. 377 [190 P. 646]; *Brinkworth* v. *Sam Seelig Co.*, 51 Cal.App. 668 [197 P. 427]; *Brown* v. *Holzwasser, Inc.*, 108 Cal.App. 483 [291 P. 661]; *Lamb* v. *Purity Stores, Inc.*, 119 Cal.App. 690 [7 P.2d 197]; *Tuttle* v. *Crawford*, 8 Cal.2d 126 [63 P.2d 1128]; *Winsby* v. *Kertell*, 10 Cal.App.2d 61 [50 P.2d 1075]; *De Verdi* v. *Weiss*, 16 Cal.App.2d 439 [60 P.2d 879]; *Stoddard* v. *Roberts Public Markets, Inc.*, 27 Cal.App.2d 166 [80 P.2d 519].

suits operates strongly in favor of plaintiffs and that it precludes reviewing courts from sustaining judgments of nonsuit if the evidence would be legally sufficient to support a verdict or judgment for the plaintiff. However dubious a plaintiff's case may appear to a reviewing court the functions of the jury must be respected and there can be no weighing of the facts beyond the inquiry whether the case of the plaintiff is entirely devoid of substantial support in the evidence. The frequency with which judgments of nonsuit are reversed should stand as a warning that too many of them are granted.