[L. A. No. 27158.   In Bank.   May 29, 1963.]

THELMA MEYER, Plaintiff and Appellant, v. GIPPIE R. BLACKMAN et al., Defendants and Respondents.

Henry E. Kappler for Plaintiff and Appellant.

Gilbert, Thompson & Kelly, George A. Kuittinen and Jean Wunderlich for Defendants and Respondents.

PEEK, J.—This is an appeal by plaintiff Thelma Meyer from a judgment of nonsuit in a wrongful death action following the fatal injury of her 16 year-old son, Henry Carl Meyer, Jr., who died shortly after an automobile in which Henry had been riding was involved in a collision.

At the outset it must be remembered that a nonsuit may be granted ". . . 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' " (*Estate of Lances,* 216 Cal. 397, 400 [14 P.2d 768].) Thus, "while in most appeals it is the duty of the reviewing court to indulge every reasonable intendment in favor of sustaining the trial court, substantially the reverse is true when the appeal is from an order of nonsuit. In the latter case the appellate court must view the evidence as though judgment had gone in favor of the

appellant, and order a reversal if such a judgment can be sustained." (*Raber* v. *Tumin,* 36 Cal.2d 654, 656 [226 P.2d 574]; see also *Jones* v. *Hotchkiss,* 147 Cal.App.2d 197, 204-205 [305 P.2d 129].)

With this in mind we turn to an examination of the record. Raymond Lewis Wood, who was 18 years old, was hired by defendants on or about December 30, 1958, as a part-time light mechanic and lot boy at their used car lot in Pomona. His duties included such tasks as keeping the cars clean, performing minor mechanical repairs, driving defendants' vehicles to a nearby service station operated by James Ballou to purchase gasoline, test-driving some vehicles he had repaired, and driving cars on errands for his employers.

A police officer testified on behalf of plaintiff that he had observed Wood in a car parked at a doughnut shop in Pomona on a Sunday afternoon prior to the fatal collision. Since the officer, who was acquainted with Wood, did not recognize the automobile, he questioned Wood and was told the vehicle "was Mr. Blackman's car, that he [Wood] was employed there." The officer then followed Wood to the lot and Blackman verified Wood's statement. According to the officer, Blackman stated that Wood had been given permission to take the car; that Wood worked on the vehicles and "was a real good mechanic, and usually when he did some work on them he took them out and tested them to see if they functioned right."

Defendants admitted that on the day of the collision, January 12, 1959, Wood was in their employ, that he performed duties, and that he had been authorized to drive one or more of their vehicles. Defendant Blackman testified that "on this particular day he was sent on an errand." It could be inferred that the errand in which he was engaged when the collision occurred was to pick up a tow chain at the "Pep Boys" parts store, located a number of blocks from the car lot. Defendants also conceded that at some time during the period of his employment Wood had made a minor adjustment on the clutch of the collision vehicle, a 1952 Studebaker.

The car lot is located approximately one block east of Hamilton Boulevard, a north-south street in Pomona. The lot faces Fifth Avenue, which runs east and west and crosses Hamilton Boulevard approximately 300 feet west of it. Fifth Avenue, at its intersection with Hamilton where the collision occurred, is a main traffic artery with red-green-yellow traffic signal. The parts store where Wood had been sent by

defendants was located on Second Street and Park Avenue, which is north and east of the car lot. Thus it would seem that the shortest route to the parts store, starting from the car lot, would have been to drive east on Fifth Avenue to Park and thence turn left and drive north on Park the 3 blocks to Second.

However, Blackman conceded that if one were at the Ballou service station at the corner of Fifth and Hamilton, or if one were south of Fifth on Hamilton Boulevard, it would be "about as direct . . . to go north on Hamilton to Second, and then right and east to Pep Boys." A charge slip signed by Wood and dated January 12, 1959, shows he purchased gasoline on defendants' credit at the Ballou service station sometime that day but before the accident. There was no evidence that Wood was directed to follow a prescribed route to the parts store. However, it does appear from testimony that the Studebaker was seen moments before the accident traveling north on Hamilton at high speed near the intersection of Ninth Street, which is south of Fifth.

When observed on Hamilton at Ninth Street the Studebaker was traveling at an estimated speed of 65 to 70 miles per hour. It was then only four blocks south of Fifth and proceeded at the latter speed through a blinking yellow caution signal marking a school crosswalk. Approximately 20 young children were then departing from school and standing alongside Hamilton Boulevard or crossing Ninth Street walking parallel to Hamilton. The witness further testified that as the Studebaker approached the yellow caution signal there was "[m]aybe a slight increase" in its speed.

One eyewitness to the collision testified that the Studebaker entered the intersection at Fifth Street at approximately 60 miles per hour against the red light, and there was no indication that the vehicle "was skidding or sliding before the impact." Another eyewitness testified that "it didn't look like any [brakes] were applied at all." The clearly posted speed limit at that point, with which it can be assumed Wood was entirely familiar because of his employment and the evidence that he frequented that area, was 35 miles per hour. Wood also must have known that Fifth Avenue was one of the thoroughfares through Pomona, and that, as observed by a witness who worked on that corner, many accidents occurred at the intersection of Fifth and Hamilton. In addition there were then pedestrians alongside the intersection and in the cross-

walks, several of whom were injured by the careening automobile.

The Studebaker collided with a large gravel-carrying truck and trailer vehicle that was proceeding west on Fifth, and had entered the intersection on the yellow caution light. The automobile struck behind the body of the truck and in front of its trailer, so that the front dual wheels of the trailer ran over the car and it was then wedged, according to an investigating police officer, ''between the right rear duals and the spring.'' The spring shackles of the trailer were then torn loose and the car was run over by the rear dual wheels and thrown against a traffic signal pole, knocking the pole down. The pole was struck by the right side of the car. One of the occupants was, according to an eyewitness, ''on the curb, [and] the car was pushed against the curb with his body in between.'' The other occupant apparently was thrown onto the sidewalk.

An investigating officer testified that the steering wheel of the automobile was damaged very little. The officer further stated that in his opinion ''the heavy blow was taken by the right side of the car,'' and it appears from exhibits that, compared to the remainder of the vehicle, damage to the driver's area was moderate. The extent of Wood's injuries does not appear in the record; however, he was able to testify at the coroner's inquest. Hospital records show that when Henry was admitted to the hospital he was ''in critical condition.'' He was unconscious, did not respond to pain, and had multiple fractures. He was also breathing with great difficulty, and died less than five hours after admission. The deceased did not have a driver's license.

There was testimony that Henry was at the Ballou Service station some minutes prior to the collision, from which it could be inferred that from there he was allowed or invited by Wood to ride in the Studebaker.

There was evidence indicating that Wood was often in and around the Ballou service station and that he drove at high rates of speed. One of the employees testified: ''Sometimes he would come in and almost slam his brakes on; other times he would leave by burning rubber and leaving black marks in the islands, and other times he would drive in and drive out as any sane person would, too.'' The employee also testified that as Wood left the station one day, '' [H]e burned rubber leaving, and he burned rubber probably all the way across the street, and then I could hear the motor accelerate fast.

As he shifted into second gear, I could hear the rubber burn; from there on, I could hear him until the traffic around us deadened it." James Ballou, lessee of the station, testified that Wood on one occasion "was dragging through the station." Ballou further stated that he observed Wood driving defendants' automobiles "fast, " and at "excessive" speeds near the intersection of Fifth and Hamilton; that "if he had a light with him . . . he would travel right on across, and I imagine if there was a speed limit he would surely be going that, the way I've ever seen him drive."

Although, as noted, defendants admit Wood was in their employ and had been sent on an errand on the day of the accident, they do not admit that he was driving at that time. However, when the evidence is viewed in light of the stated rules, the jury could properly have inferred that Wood was the driver and that decedent Henry was the guest. Wood was entrusted to drive the Studebaker, and only he held an operator's license. Also, the extensive injuries to the right or passenger side of the vehicle, coupled with the grave extent of Henry's injuries, supports an inference that Henry was sitting on the right side of the car. By contrast the steering wheel was very slightly damaged and Wood recovered sufficiently to testify at the coroner's inquest. Furthermore, the presumption "That a person is innocent of crime or wrong" (Code Civ. Proc., § 1963, subd. 1) applies in plaintiff's favor indicating that Henry was not operating the vehicle without a license in violation of law. (Veh. Code, § 250 [presently § 12500].) Finally, it appears that since the operator is chargeable with negligence or willful misconduct, the presumption that a deceased person exercised due care (*Scott* v. *Burke,* 39 Cal.2d 388, 394 [247 P.2d 313]) also supports the position that Henry was not the operator.

This court has held that "In each case involving scope of employment all of the relevant circumstances must be considered and weighed in relation to one another." (*Loper* v. *Morrison,* 23 Cal.2d 600, 605 [145 P.2d 1].) Here the evidence establishes that the Studebaker was owned by the defendants and would have supported a conclusion by the jury that at the time of the accident it was being operated by their employee, Wood. Under such circumstances " 'an inference arises sufficient to support a finding that the employee was operating the automobile (a) by the authority of his employer, and (b) within the scope of his employment.' " (*Halbert* v. *Berlinger,* 127 Cal.App.2d 6, 18 [274 P.2d 274].)

Furthermore, the mere fact that Henry happened to be riding in the car at the time of the accident would be insufficient to take Wood outside the scope of his employment if he was then still carrying out his employers' business. (*Barall Food Stores* v. *Bennett* (1944) 194 Okla. 508 [153 P.2d 106, 109-110] ; see *Fuller* v. *Chambers,* 169 Cal.App.2d 602, 608 [337 P.2d 848].) Acceptance of an unauthorized invitation by a rider some minutes prior to the accident, causing Wood to appear to have been combining personal business with that of his employers, cannot as a matter of law be said to vitiate any of Wood's subsequent acts directed, at least partly, to benefiting his masters. Any indication to the contrary in *Albers* v. *Shell Company,* 104 Cal.App. 733, 745-746 [2] [286 P. 752], is disapproved.

Concerning whether Wood had physically deviated from the scope of employment, it can readily be inferred that he was sent on an errand to the Pep Boys, and it is undisputed that when the Studebaker hit the truck it was traveling north on Hamilton Boulevard on an acceptable route to that store. Thus, even if it could be said that Wood had departed from carrying out the authorized business of his employers while driving several blocks south of Fifth Avenue, plaintiff was entitled to have the jury pass upon the question whether as he drove near the intersection of Fifth and Hamilton heading toward the Pep Boys, he had reentered the scope of his employment. (See *Cain* v. *Marquez,* 31 Cal.App.2d 430, 439-442 [88 P.2d 200] ; Rest.2d Agency, § 237.) Whether the servant has returned to the task of carrying out his master's business is, except in those situations where as a matter of law the servant has completely departed the scope of employment when the accident happens (see, e.g., *Gordoy* v. *Flaherty,* 9 Cal.2d 716, 717-718 [72 P.2d 538]), a question for the trier of fact. (See *Fuller* v. *Chambers, supra,* 169 Cal. App.2d 602, 608.)

Thus the inference of scope of employment arising from Wood's employment by defendants and their ownership of the fatal vehicle (see *Blank* v. *Coffin,* 20 Cal.2d 457, 462 [126 P.2d 868]), was not dispelled as a matter of law as defendants contend. Such an inference can be rebutted only by ''clear, positive and uncontradicted evidence which is not open to doubt.'' (*Engstrom* v. *Auburn Auto. Sales Corp.,* 11 Cal.2d 64, 70 [77 P.2d 1059].) Such conclusive evidence in defendants' favor does not appear in the record before us, especially because of the nearness of the accident

to defendants' place of business and the direction of the Studebaker at the moment of collision.

Plaintiff contends there is sufficient evidence of Wood's willful misconduct proximately causing her son's death to present a question for the trier of fact, and thus permit recovery within the exception to the so-called guest statute.[1] Willful misconduct " 'involves deliberate, intentional or wanton conduct in doing or omitting to perform acts, with knowledge or appreciation of the fact, on the part of the culpable person, that danger is likely to result therefrom.' " (*Emery* v. *Emery*, 45 Cal.2d 421, 426 [289 P.2d 218].)

Or as more recently stated, "Wilful misconduct means intentional wrongful conduct, done either with knowledge that serious injury to the guest probably will result or with a wanton and reckless disregard of the possible results." (*Goncalves* v. *Los Banos Mining Co.*, 58 Cal.2d 916, 918 [26 Cal. Rptr. 769, 376 P.2d 833].)

"In determining whether the driver of a car is guilty of wilful misconduct, his entire course of conduct, including his speed, is to be considered. . ." (*Hallman* v. *Richards*, 123 Cal.App.2d 274, 281 [266 P.2d 812]), and the existence of willful misconduct is essentially a question of fact. (*Harlow* v. *Van Dusen*, 137 Cal.App.2d 547, 550 [290 P.2d 911].) Thus since it cannot be stated that Wood's conduct did not as a matter of law amount to willful misconduct, plaintiff had a right to have the jury pass upon that issue.

Here there was evidence that a few moments before the collision Wood was driving defendants' automobile 65 to 70 miles per hour, that he speeded up as he drove through a blinking yellow light marking a school crosswalk, and that children were then departing the school. Wood was then only 4 blocks from and approaching the intersection with Fifth Avenue, a principal thoroughfare. The jury could easily have found on the evidence which it heard that Wood was aware of the traffic control signal at the intersection. Although the speed limit

---

[1]Section 403 of the Vehicle Code (presently Veh. Code, § 17158), provided: "No person who as a guest accepts a ride in any vehicle upon a highway without giving compensation for such ride, nor any other person, has any right of action for civil damages against the driver of such vehicle or against any other person legally liable for the conduct of such driver on account of personal injury to or the death of such guest during such ride, unless the plaintiff in any such action establishes that such injury or death proximately resulted from the intoxication or wilful misconduct of said driver."

was plainly posted at 35 miles per hour the evidence indicated that Wood entered the intersection at approximately 60 miles per hour against the red light, and hit the truck without making any apparent attempt to apply his brakes.

The foregoing evidence, coupled with the facts of extreme damage to the vehicle, could well support a finding by the trier of fact that Wood drove the Studebaker "with a wanton and reckless disregard of the possible results." (See *Goncalves* v. *Los Banos Mining Co., supra,* 58 Cal.2d 916, 918 [sufficient evidence of willful misconduct where driver apparently ignored stop sign and proceeded into intersection without abating excessive speed]; *Jones* v. *Ayers,* 212 Cal. App.2d **646, 654** [28 Cal.Rptr. 223] [high speed, knowledge of stop signs, opportunity to slow vehicle, no apparent attention paid to stop signs and entry into intersection without reduction of speed]; *Bristow* v. *Brinson,* 212 Cal.App.2d 168, 175 [27 Cal.Rptr. 796] [driver familiar with intersection drove past warning sign and through stop sign at 40 miles per hour]; *Palmer* v. *Agid,* 171 Cal.App.2d 271, 277 [340 P.2d 303] [driver who had had two drinks ran a red light at 60 miles per hour colliding with a truck without applying his brakes].) It follows that defendants' contention that there is no evidence from which the driver's willful frame of mind or intent may be inferred (see *Lovett* v. *Hitchcock,* 192 Cal.App.2d 806, 812-813 [14 Cal.Rptr. 117]) is without merit. In fact Wood was familiar with the streets and the speed limits in that area and yet ran or "jumped" the red light at a busy intersection while traveling at excessive speed. This evidence would be sufficient to support a finding that Wood intentionally acted with a wanton disregard of possible injury to himself and to his passenger in approaching the intersection. (See *Bristow* v. *Brinson, supra,* 212 Cal. App.2d 168, 175-176; *Munson* v. *Friedman,* 154 Cal.App. 2d 73, 76-77 [315 P.2d 727]; *Anderson* v. *Newkirch,* 101 Cal.App.2d 171, 178-179 [225 P.2d 247].)

■ Defendants argue that in no event should they as principals, be liable for Wood's actions in the scope of employment causing injury to Henry, since Wood had no authority to invite passengers. Reliance is placed upon section 242 of the Restatement Second of Agency (1958), stating: "A master is not subject to liability for the conduct of a servant towards a person harmed as the result of accepting or soliciting from the servant an invitation, not binding upon the master, to enter or remain upon the master's premises or

vehicle, although the conduct which immediately causes the harm is within the scope of the servant's employment."

However, the latter rule of the Restatement was adopted against a background of many divergent and contrary authorities (see Rest.2d Agency, Appendix (1958), § 242, pp. 383-386), and the rule of liability in this jurisdiction as expressed in *Albers* v. *Shell Company, supra,* 104 Cal.App. 733, is contrary to that of the Restatement. In *Albers,* a truck driver picked up a guest contrary to company rules, and the rider was killed in an accident which occurred as the driver continued on his employer's business. After discussing the relevant authorities indicating that an employer is liable to such a rider where there is willful misconduct by the driver, the court reversed judgment for the guest, stating that the record "manifestly fails to show any wilful or wanton act or omission on the part of the driver. . . ." (104 Cal.App. at p. 752.)

The rule of section 242 of the Restatement is "based upon the view that by accepting the hospitality of the servant and causing him to commit a breach of duty, the intruder had so identified himself with the servant that it is just that his claim against the master should be forfeited. Further, although the servant drives 'in scope of employment,' he is also driving for the benefit of the intruder." (Rest.2d Agency, Appendix, pp. 384-385.) But it is well known that employee-drivers often commit such breaches of duty by carrying unauthorized passengers, and so long as injury to the rider occurs while the driver is carrying out his employer's business, the employer must be held liable under the familiar principle of liability for a servant's torts committed as part of the transaction of the master's business, even though the injury may accrue coincident with behavior contrary to the master's express orders. (See *Johnson* v. *Monson,* 183 Cal. 149, 151 [190 P. 635]; *Kuharski* v. *Somers Motor Lines, Inc.* (1945) 132 Conn. 269, 274 [43 A.2d 777].)

Moreover, acceptance in this jurisdiction of the section 242 rule of employers' nonliability would require elimination of employers' liability for servants' injuries to unauthorized riders as set forth in *Albers* v. *Shell Company, supra,* 104 Cal.App. 733, and the many other cases recongizing the employer's liability for his driver's willful misconduct toward riders invited by the driver contrary to the master's orders. (See, e.g., *Ball* v. *Whitaker* (1960) 47 Tenn.App. 677 [342 S.W.2d 67, 70-71]; *Slother* v. *Jaffe* (1947) 356 Pa. 238 [51

A.2d 747, 749-750] ; cases collected in Note 23 N.C.C.A. (N.S.) (1949), p. 520; see also *Dyer* v. *McCorkle,* 208 Cal. 216, 224-225 [280 P. 965]; *Kuharski* v. *Somers Motor Lines, Inc., supra,* 132 Conn. 269, 273-274; *Kakluskas* v. *Somers Motor Lines, Inc.* (1947) 134 Conn. 35, 41-43 [54 A.2d 592] ; *Jewel Tea Co.* v. *Sklivis* (1936) 231 Ala. 590 [165 So. 824, 825-826] ; *Harper* v. *Griffin Lumber Co.* (1948) 250 Ala. 339 [34 So.2d 148, 150].)

Finally, the employer is in the best position to prevent the operation of his vehicles by individuals prone to willful and reckless driving, as was the employee-operator herein. (See *Sabella* v. *Wisler, ante,* pp. 21, 28-29 [27 Cal.Rptr. 689, 377 P.2d 889]; *Biakanja* v. *Irving,* 49 Cal.2d 647, 651 [320 P.2d 16, 65 A.L.R.2d 1358].)

In view of the foregoing conclusions, it is unnecessary to consider the further contentions advanced by the plaintiff.

The judgment of nonsuit is reversed.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., Peters, J., and Tobriner, J., concurred.