[Civ. No. 22157.   First Dist., Div. Three.   Jan. 20, 1966.]

ERNEST A. TREJO et al., Plaintiffs and Appellants, v. JOSEPH P. MACIEL et al., Defendants and Respondents.

Morgan, Beauzay & Holmes and Robert Morgan for Plaintiffs and Appellants.

Hoge, Fenton, Jones & Appel, John W. Appel, Popelka, Graham, Hanifin, Van Loucks & Allard and Robert J. Popelka for Defendants and Respondents.

DEVINE, J.—Plaintiffs, who were injured in an automobile accident for which liability is admitted by defendant Joseph P. Maciel, appeal on the grounds (1) that the judgment against him is inadequate in amount, and (2) that the judgment in favor of the other defendant is erroneous.

Recitation of the facts preceding the accident is given below, but at this point the facts of the accident itself are stated. On December 1, 1961, at 12:55 a.m., while appellants were seated in a vehicle waiting for a red light to change, a car driven by Joseph P. Maciel struck them from the rear. Maciel denied that he had been drinking, but the police officer who investigated the accident testified that he detected the odor of alcohol on his breath, that his voice was slurred and mushy, and that he refused to take a blood-alcohol or a urine-alcohol test. Maciel testified that he saw neither appellants' car nor the red light, but his car had laid down about 60 feet of skid marks before the collision.

## Damages

Appellants Emma Trejo and Minnie Jorgensen contend that there was an inadequacy of damages awarded to them and that this was caused by errors in admission of evidence and in instructions to the jury.[1] Each of these plaintiffs suffered a compression fracture of one of the vertebrae. Their physician, Dr. Lawrence, a general practitioner, testified that each of them would have some permanent instability of the back and some discomfort in doing housework. The attorney for plaintiffs asked the physician to send these plaintiffs to a neurosurgeon, Dr. MacKinnon, and an orthopedist, Dr. McClintock. These specialists examined the ladies and made reports of their examinations. Neither Dr. MacKinnon nor Dr. McClintock was produced as a witness. In the cross-examination of Dr. Lawrence, however, there came into evidence without objection the fact that Dr. MacKinnon's and Dr. McClintock's neurological findings of Mrs. Jorgensen were negative; and that as of July 16, 1962, Dr. McClintock doubted that Mrs. Trejo was disabled by her symptoms although she was quite concerned about them. Dr. Arnstein, a neurosurgeon called by the defense, testified that Mrs. Jor-

---

[1] Ernest A. Trejo also appeals on the same ground, but at oral argument his assertion of inadequacy of damages was virtually abandoned.

gensen had suffered no damage to the nervous system and that she would have some minor discomfort which would become progressively less severe. He testified that Mrs. Trejo had escaped significant damage to her nervous system, that she had no disability, and that it was his impression that she was a somewhat emotional woman. The award to Mrs. Jorgensen was $4,500, which includes $1,242 of expenses. Mrs. Trejo's verdict was $5,000, which includes $1,484 in medical bills. There was also a wage loss which she claims was $3,147 for 17 months, but because Dr. McClintock doubted her disability as of July 16, 1962, it is likely that the jury made a substantial discount in the claimed wage loss.

The asserted errors in the admission of evidence and in argument to the jury are: (1) That a report of Dr. Arnstein, which had not been admitted in evidence, was read to the jury over the objection of counsel. But the doctor had testified at length to everything that is in the report and the jury was instructed that if the report was not similar to the testimony they were to disregard it. Actually, there is no dissimilarity. (2) That reports of Drs. McClintock and MacKinnon were read to the jury and that they are hearsay. It will be recalled that these doctors did not examine Mrs. Jorgensen and Mrs. Trejo for the *defense* but at the request of plaintiffs' own physician, who in turn had been requested by plaintiffs' counsel to have the specialists' examinations made. If this was hearsay it was not prejudicial, because in the first place it is not substantially different from the testimony which was admitted without objection about the conclusions which these two specialists had made, and in the second place, since plaintiffs did not call these specialists to testify after having been examined by them, the jury no doubt would have concluded that the testimony would not have been favorable to appellants.

Appellants find fault with the instructions to the jury, and to a certain extent they are correct in their contention, but we find no prejudice. Following all of the instructions on damages, both general and special, the court instructed the jury that any of the elements of damage thus far specifically mentioned could be proved by evidence which, if believed, fixed the amount precisely or placed it within precise limits or gave adequate information to enable the jurors to fix the loss with a reasonable degree of certainty. This instruction is appropriate to special damages only. The court, however, had instructed the jury that the law does not pre-

scribe any definite standard of compensation for pain and suffering, and had instructed on mental suffering. That the jury did not take the misplaced instruction literally is shown by the fact that it awarded Mrs. Jorgensen about $3,258 in general damages and Mr. Trejo about five times the amount of his special damages.[2] Just what was awarded to Mrs. Trejo in general damages is difficult to tell because of the uncertainty of the award of loss of wages. At the hearing of the motion for new trial the judge said that two of the verdicts (Mr. Trejo's and Mrs. Jorgensen's) were definitely satisfactory. He thought the award for Mrs. Trejo might have been somewhat higher if the jury had believed she was not able to go back to work, by which, no doubt, he meant that she could not work until the time stated by her as opposed to the conclusion reached by Dr. McClintock.[3] The judge also expressed himself as impressed by the argument made by defense counsel that the "jury could have given a larger judgment against Joe." The argument referred to was to the effect that because the case was one of admitted liability and because Joseph P. Maciel was a heavy drinker and had been involved in violations of the law, the jury would have given substantial awards if it was at all impressed with the claims of serious injury.

A review of the whole issue of damages shows that the only physician testifying for plaintiffs, Dr. Lawrence, did not testify to serious residuals, that the absence of the testimony of the two specialists was a telling factor, and that the testimony of Dr. Arnstein was quite effective. ■ The primary responsibility for review of the award of damages is that of the trial judge. (*Miller* v. *San Diego Gas & Electric Co.*, 212 Cal.App.2d 555, 562 [28 Cal.Rptr. 126].) The judgment against Joseph P. Maciel is not to be disturbed.

### Liability of Employer

Appellants predicated liability of Charles P. Maciel, Inc., a retail liquor dealer, hereinafter called the "company," on two propositions: (1) that at the time of the accident Joseph P. Maciel, a part-time employee, was engaged in a special errand on behalf of the company; and (2) that his brother

---

[2]Although Mr. Trejo's damages have not been discussed herein because it is not contended they were inadequate, the fact that they do considerably exceed the amount of the special damages gives evidence that the jury did not regard the instruction complained of as confining their award to an amount approximating the specials.

[3]That is, as of July 16, 1962.

Charles, president of the company, knew that Joseph was an alcoholic and an incompetent driver. The second proposition was considered by the pretrial conference judge to have been one of primary negligence as distinguished from the *respondeat superior* theory of the first. At trial, however, plaintiffs submitted an instruction, which was given, which referred to knowledge by Charles of Joseph's incompetency as a driver in causing injury while Joseph was on a special errand. Thus, it was essential to success by plaintiffs that they establish that Joseph was engaged in a special errand at the time of the accident. The facts relating to Charles' knowledge of his brother's driving capacity, however, may be relevant in the matter of the special errand. Charles admitted that he knew of two incidents: a drunk driving charge, and another accident in which Joseph's license had been suspended because he did not have insurance. He testified that Joseph had told him that his license had been restored, although Joseph testified that he did not recall such an inquiry. Joseph was arrested at the store about 40 days before the accident, and Charles knew of this but made no inquiry of the authorities about the nature of the charge.

We turn to the subject of special errand. Occasionally, Charles would ask Joseph to bring a supply of liquor from one of the company's stores to the Tropicana Store owned by the company, because this store was in the neighborhood of the residence of Joseph's ex-wife and Joseph would visit his family. On the night of the accident Charles needed certain items rather urgently and telephoned Joseph to bring them from the Hyde Park Store in the west part of San José to the Tropicana Store in the east. The call was at about 10:30 and Joseph, driving his own car, arrived at midnight or shortly after. Charles testified that Joseph was perfectly sober. Charles did not see if there was anyone in the automobile with Joseph.

The trial on the issue of liability was largely a contest between plaintiffs' endeavor to show that Joseph drove directly from the Tropicana Store to the point of the accident and defendant company's attempt to establish that when Joseph left the store he drove to his ex-wife's place, that his errand thus came to an end, and that thereafter he drove into the accident. Joseph's brother-in-law Flores and Mrs. Flores testified that he arrived at the ex-wife's home at about midnight, that be brought his son with him, that he was sober and that he had nothing to drink at the house, and

that he stayed about an hour and a half. Nothing was said to them about Joseph's having delivered or being about to deliver the liquor to the store. Joseph testified that he had had nothing to drink for 24 hours before the accident. Although one would have the expectation that Joseph would state definitely the sequence of events, such an expectation would be futile. He testified, variously (1) that he went straight from his brother's store to the scene of the accident and did not stop at any place, (2) that he dropped off his son at his ex-wife's house first and then delivered the liquor, (3) that his brother-in-law had taken the boy to the house, (4) that he was not at his ex-wife's place on the night of the accident (this was in a deposition), (5) that a statement he had signed "must be right," in which he said that he went to the store first, then left his son off with his ex-wife, (6) that no one was at the Tropicana Store, (7) that he did see his brother at the Tropicana and gave him the liquor. At no time did Joseph testify to a "visit" with his ex-wife but only to dropping off his son.

From the jumble of testimony and statements given by Joseph and from other evidence, the jury could, of course, decide that he delivered the liquor after a visit to his ex-wife's place or, as it probably did, that Joseph delivered the liquor first, then went to his ex-wife's, then drove to the point of the accident. The Tropicana Store and the ex-wife's home are very close, the home being slightly on the side nearer to the origin of Joseph's errand. Thus, if he stopped first at the store, he would then retrace his journey slightly to get to the home, but on leaving the residence for his own home, he would very shortly turn into the same highway, Story Road, which he would have traversed had he not stopped but had gone directly from the Tropicana Store toward his home. On this highway the accident happened. The route was not the one Joseph would have taken to go from the Hyde Park Store to his home.

The subject of special errand presents questions of fact for the jury. All of the relevant circumstances must be considered and weighed in relation to one another. (*Loper* v. *Morrison,* 23 Cal.2d 600, 605 [145 P.2d 1]; *Meyer* v. *Blackman,* 59 Cal.2d 668, 675 [31 Cal.Rptr. 36, 381 P.2d 916]; *Fuller* v. *Chambers,* 169 Cal.App.2d 602, 609 [337 P.2d 848]; *Boynton* v. *McKales,* 139 Cal.App.2d 777, 790 [294 P.2d 733].) The problem on this appeal is whether the jury was correctly and adequately instructed on the law. The applicable principles

of law, therefore, are to be considered together with an analysis of the instructions.

■ An employee who has gone upon a special errand does not cease to be acting in the course of his employment upon his accomplishment of the task for which he was sent. He is in the course of his employment during the entire trip. (*Robinson* v. *George,* 16 Cal.2d 238, 246 [105 P.2d 914]; *Schreifer* v. *Industrial Acc. Com.,* 61 Cal.2d 289 [38 Cal. Rptr. 352, 391 P.2d 832]; *Vivion* v. *National Cash Register Co.,* 200 Cal.App.2d 597 [19 Cal.Rptr. 602]; *Ryan* v. *Farrell,* 208 Cal. 200 [280 P. 945].) Thus, had the jury concluded that Joseph was going directly from the Tropicana Store toward his home (as was his original testimony at the trial as well as at deposition), there is little doubt that the company would have been held liable. The jury was adequately instructed as to this possible sequence of events.

But what if the jury believed that Joseph's trip from the store toward his home was interrupted by a visit to his ex-wife's residence? In general, the full trip which would be the natural consequence of the special errand would be within the scope of employment. The problems then are: What may fairly be considered the termination of the trip? If it were considered to be Joseph's home, what would be the effect of a stopover at his ex-wife's residence? These two run pretty much together because the terminal point of the trip would, unless broken off by the complete departure described below, be the point toward which the driver was going as his final destination. His intent is one element to be considered. (*Loper* v. *Morrison, supra,* p. 606.) The subjective expectation of the employer likewise is an element. (*Loper* v. *Morrison, supra,* p. 606.) But it would not necessarily be controlling. Thus, although Charles testified that after Joseph would have delivered the liquor he would be ''all through with me,'' he could not avoid the company's responsibility for the remainder of Joseph's journey merely by this process of disclaimer. If it were so, the company would not be liable even on a direct return trip. This would be violative of the special errand rule. The rights of third parties are not to be concluded thus. The real test, then, is whether Joseph, if he did make the stop testified to by his ex-wife's relatives following the stop at the store, made such a departure from the journey on behalf of his employer as to cause a termination of the course of employment.

It is well recognized that there may be a combination of a mission for the employer with a personal mission of the employee. (*Fuller* v. *Chambers, supra,* 169 Cal.App.2d 602; *Ryan* v. *Farrell, supra,* 208 Cal. 200.) In the case before us, the combination would exist if at the point of the accident Joseph was truly returning from both the errand to the store and the visit to his ex-wife's home. ▮ Other principles come into play at this time, namely: (1) No nice distinction is made as to which business the servant was actually pursuing at the time of the injury, but the master will be held responsible unless it clearly appears that the servant could not have been directly or indirectly serving his master. (*Ryan* v. *Farrell, supra,* p. 204; 1 Magana, Motor Vehicle Accidents, § 43.03, pp. 592, 593.) ▮ (2) The breaking off from the master's business must be complete so that it is no longer a mere deviation but a complete departure. (*Westberg* v. *Willde,* 14 Cal.2d 360, 372-373 [94 P.2d 590]; *Gipson* v. *Davis Realty Co.,* 215 Cal.App.2d 190, 213 [30 Cal.Rptr. 253]; *Fuller* v. *Chambers, supra,* p. 608; *Tyson* v. *Romey,* 88 Cal.App.2d 752 [199 P.2d 721]; *Cain* v. *Marquez,* 31 Cal. App.2d 430 [88 P.2d 200]; *Wagnitz* v. *Scharetg,* 89 Cal.App. 511 [265 P. 318]; *Kruse* v. *White Brothers,* 81 Cal.App. 86, 92 [253 P. 178]; *Weber* v. *Wiley B. Allen Co.,* 64 Cal.App. 274 [221 P. 663].) (3) If there has been a deviation, there may be a resumption of the master's business. (*Meyer* v. *Blackman, supra,* 59 Cal.2d 668, 676; *Cain* v. *Marquez, supra,* pp. 439-442.) In this regard, the "business" of a return trip of a special errand, of course, is not connected with performance of other tasks directly of benefit to the master. The act of driving from the place of performance of the errand is itself the business at hand. ▮ (4) The fact that the employee becomes intoxicated during a deviation does not necessarily establish a complete departure from his duties. (See cases collected in 51 A.L.R.2d 31.) On this point, the knowledge by the employer of previous conduct of the employee becomes relevant. ▮ (5) Important factors in determining whether there has been a complete departure or merely a deviation are those of time and place. (Rest.2d Agency, §§ 228, 237.) Thus, the fact that the employee is on the same route of return which he would use for both his employer's mission and his own is a factor tending to show a combination of missions. (See cases collected in 51 A.L.R.2d 94-96.) The amount of time consumed in the personal activity is likewise to be weighed. (Rest.2d Agency, § 237.) The

nature of the digression is also to be considered. If the digression was in itself an inducement for Joseph to undertake the special errand or was connected with the performance of the errand, for example, as a reward, the jury would be entitled to weigh these facts in deciding whether there had been the complete departure from duty which is requisite to terminate course of employment. (See *Boynton* v. *McKales, supra,* 139 Cal.App.2d 777, 789.)

We proceed to examine the instructions. The court instructed the jury that if the employee is returning to his home on a special errand, he is within the scope of his employment until he has returned or "until he deviates therefrom for personal reasons." This, if not incorrect, is at least inadequate in that it does not contain the requisite element that in order to break off the course of employment there must be a complete departure from the employer's business. Since there *was* a deviation, which was at least partly for personal reasons, if the fact, as found, was that the visit to the store preceded that to the ex-wife's home, the instruction just mentioned would be extremely harmful, if not fatal, to plaintiffs' case unless it were explained in other instructions. The court did instruct the jury that "when the object of the departure has been accomplished and the employee re-engages in the discharge of his duty, the employer's responsibility *may* immediately attach." (Italics added.) This was a modification of an instruction offered by the plaintiffs, which had stated that when the employee re-engages in the discharge of his duty the employer's responsibility *attaches* immediately. It was error to enfeeble the proffered instruction. When the employee re-engages in his duty the employer's responsibility *does* attach immediately. The question is whether as a fact the employee has resumed his duty, which, as stated above, would be simply the duty of driving on a return trip, even if this were combined with return trip from the social visit, provided complete departure had not occurred. Tests of place and time of the accident and nature of the deviation should have been presented to the jury.

Another given instruction tells the jury that there is a difficulty in determining when the departure ended and the employee again entered upon the scope of his employment. True enough, there is a difficulty, and the instruction implies that there could be a resumption of duty, but it gives no

guidance to the jury. (This instruction was a truncated one. As offered by the plaintiffs, it contained a sentence reading: "A servant who temporarily abandons his line of travel for a purpose of his own, again becomes a servant when he reaches a point on his route which he necessarily would have passed had he obeyed his orders." The eliminated sentence is faulty in that it refers to obedience to orders, and there is no evidence of orders to apply after delivery of the merchandise.)

We conclude that the jury did not have adequate instructions. Liability of Joseph having been admitted and his employment on the special errand of the company having been conceded, there was but one point for the jury to decide if it concluded that the family visit came later than the delivery of the liquor, namely, determining whether there had been complete departure from the course of employment or deviation with resumption thereof. Indeed, when the jury came back for further instructions on the point, one of the jurors asked specifically if after an employee does something for himself he comes back to the regular route, he is "under his employer" when he returns. The judge declined to answer the question, saying it was a fact to be determined on the basis of the given instructions. The responsibility for adequate instruction becomes particularly acute when the jury asks specific guidance.

Although the instructions offered by the plaintiffs do not cover the issues of the case sufficiently and some were faulty,[4] the responsibility remained on the court to instruct the jury on the controlling legal principles. (*Herbert* v. *Lankershim*, 9 Cal.2d 409, 482 [71 P.2d 220]; *Distefano* v. *Hall*, 218 Cal.App.2d 657, 672 [32 Cal.Rptr. 770]; *Jones* v. *Burgermeister Brewing Corp.*, 198 Cal.App.2d 198, 204 [18 Cal.Rptr. 311].)

We are the more ready to regard inadequacy of instructions to the jury as ground for reversal, despite some failure of appellants' counsel to submit correct and sufficient ones, because: (1) The drawing of instructions applicable to this type of case is difficult. (2) Plaintiffs in this kind of case are

[4]For example, plaintiffs proposed an instruction that "Where the employee drove from A to B on business and thence to C for pleasure, on the return trip he would be outside the scope of employment while traveling from C to B, but within such scope while traveling from B to A." This does not take into account the time factor, nor the character of the deviation, and, besides, Joseph was not traveling back to "A," the Hyde Park Store.

usually dependent on witnesses for the defense to tell the facts relating to the errand, and in this case the deposition of Joseph had given plaintiffs an account at utter variance on the crucial point with testimony elicited under cross-examination by the defendant company's counsel. (3) On motion for new trial, the judge expressed himself as dissatisfied with the testimony of defense witnesses and was considering steps to have the award go against the company. (4) He received assurance from counsel for Joseph that because of Joseph's admission of liability and his being an uninsured driver, plaintiffs have uninsured motorist coverage. This appears to be incorrect, because it would not apply for the benefit of plaintiffs by reason of their having obtained judgment against Joseph Maciel (unless there were an agreement with their carrier, of which there is no evidence). (Ins. Code, § 11580.2, subd. (c) (3) ; *Travelers Indemnity Co.* v. *Kowalski,* 233 Cal.App.2d 607 [43 Cal.Rptr. 843].) (5) The fact that Charles was willing to have Joseph drive on his business at midnight, although he knew that his license had been revoked and had not demanded to see that it was restored, weighs in the scale in favor of liberality for appellants in considering the matter of the inadequate instructions to the jury.

Judgment for plaintiffs against Joseph P. Maciel affirmed. Judgment in favor of Charles P. Maciel, Inc., reversed.

Draper, P. J., and Salsman, J., concurred.

The petition of respondent Charles P. Maciel, Inc., for a hearing by the Supreme Court was denied March 16, 1966.