[No. B004907. Second Dist., Div. Six. Mar. 4, 1985.]

ROBERTA WEHR et al., Petitioners, v.
WORKERS' COMPENSATION APPEALS BOARD and
SAN LUIS OBISPO COASTAL UNIFIED SCHOOL DISTRICT,
Respondents.

## COUNSEL

William A. Herreras for Petitioners.

Nicholas A. Sanford, Richard E. Rader, Richard W. Younkin, William B. Donohoe and Alvin R. Barrett for Respondents.

## OPINION

**ABBE, J.**—Petitioners Roberta Wehr and Jack Wehr, Jr., as dependents of Jack Wehr, deceased, seek review of the order of respondent Workers' Compensation Appeals Board denying reconsideration of its decision rescinding the award and findings of the workers' compensation judge (WCJ) that Roberta and Jack Wehr, Jr., are entitled to benefits for the industrially caused death of Jack Wehr. We hold that the board's order must be affirmed.

We summarily denied applicants' petition for writ of review; however, the Supreme Court granted applicants' petition for hearing and retransferred the matter to this court with direction to issue a writ.

Jack Wehr was employed as a maintenance man by respondent San Luis Obispo Coastal Unified School District for several years until his death on August 31, 1982. His widow Roberta, on behalf of herself and their minor son Jack, Jr., applied for death benefits as dependents (Lab. Code, § 4702), claiming that the decedent's liver injury resulted from industrial exposure to chemicals and infectious bacteria.

Evidence presented by applicants included testimony of the widow and two of decedent's coemployees (Mr. Callaway and Mr. Weir), a list of products that the school district's maintenance men were exposed to in their work, and medical reports of Doctor Silipo.

Mr. Callaway testified that he had worked with the decedent for five years, but not the last two years. Their work included servicing and cleaning rain gutters, sewers, boilers, heating units, urinals, attics and basements.

Coemployee Weir testified that he worked with decedent the last six months on toilets and sewer lines, some of which emitted unpleasant odors. During the last week of decedent's employment, they worked on a "very clean job" installing a leach line from a septic tank.

The widow testified that the decedent, age 55, had been in good health a month prior to Friday, August 27, 1982. On that day, he returned home from a week working on a sewer and complained that he "wasn't feeling well" and had a headache, sore throat and fatigue. Four days later he was admitted to a hospital and died that day.

The autopsy report did not establish the cause of Mr. Wehr's death. The amended death certificate indicated that the cause of death was endotoxic shock due to "Fatty infiltration of Liver, Severe—undetermined cause."

Applicants also presented in evidence a letter prepared and signed by Mr. Lascelles, a director of the school district's building and grounds. The letter set forth a list of products used by decedent in his employment, such as "Rectorseal," a pipe threading compound; "WD-40" and "Ezy-off," penetrants; "Krylon," "Anytime," and "Lawson & State," spray paints; "Biatron," a drain cleaner; "Dap," a glazing compound; "Synkoloid," a sparkling paste; "Henry" and "Floormastic," adhesives; soldering fluxes; brazing fluxes; soldering acids and gasoline. Applicant also occasionally used paint thinners, epoxy glues, wood fillers, stains, paint removers, solvents, boiler compounds, fiberglass resins and concrete adhesives.

All of the products on the aformentioned list are sold to the general public. There was no evidence as to the actual chemical composition of the listed products.

The evidence included reports of two physicians, Doctor Silipo and Doctor O'Neill. Neither physician had examined Mr. Wehr. Consequently, their reports were based solely on applicant's "history." Both physicians concluded that the cause of Mr. Wehr's death was unknown.

Doctor Silipo acknowledged that the precise agent or agents responsible for Mr. Wehr's death were unknown, and that the exact cause of death was problematical and undetermined. Nevertheless, Doctor Silipo opined three

possible causes of death: job exposure to chemicals, job exposure to infectious bacteria, and a combination thereof.[1]

As to chemical exposure, Doctor Silipo based his opinion on a table in " 'an article, "Effects on the Liver of Chemicals Encountered in the Work Place," by Susan Pond, in the Western Journal of Medicine . . . .' " The table, entitled "Workplace Chemicals That Have Produced Hepatic Effects in Animals or Humans or Both," set forth approximately 60 specific chemicals. Doctor Silipo stated that the chemicals in the table are compatible with the "chemicals" (brand products) in the list prepared by Mr. Lascelles, and opined that "We can make a good case for the [decedent's] exposure to a wide variety of chemicals, including those known to be potentially injurious to the liver as an agent or agents involved in his terminal illness."

It is noteworthy that except for gasoline, no item in the table relied upon by Doctor Silipo appears in the list prepared by Mr. Lascelles.

Doctor O'Neill, on the other hand, concluded that the decedent's fatty liver condition was not explained on available information nor on presumption of chemical exposure. The varied origins of the fatty liver make it impossible to speculate as to a source without documenting or validating physical findings such as microscopic changes indicative of some specific process. It was also mere speculation to broadly mention various materials the decedent may have come in contact with in working in sewers and having been exposed to various other microbiologic pollutants. The information available does not document any specific hepatic toxins, and the microbiologic exposures are equally vague. "I have not seen any information which would clearly outline his cause of death, much less indicate an occupational relationship between that unknown cause of death and any exposures he had in the workplace."

The WCJ found that each applicant was entitled to one-half of the $75,000 death benefit. In his report on reconsideration, the WCJ concluded that applicants met their burden of proving industrial causation of death, noting that although Doctor Silipo's report acknowledged that the cause of death

---

[1]Doctor Silipo concluded his report as follows: "The bottom line of this whole problem, as I see it, is as follows: [¶] 1. He clearly had very significant liver disease. [¶] 2. Chemicals and/or infection are common causes of such liver disease. [¶] 3. We know he was exposed to a great variety of chemicals at work, so much so, that Mr. Lascelles was actually 'somewhat surprised at the variety of products which these people use.' [¶] 4. The man was working in and/or around a sewer and/or a cesspool one week prior to his death. There was no question he was exposed to significant viral and bacterial agents. [¶] 5. By contrast, his personal habits and his home environment—to the best of my knowledge—are considered to be ideal and in a very marked contrast to potentially harmful agents which surrounded him at work."

was unknown, problematical and undetermined, Doctor Silipo had opined three possible causes of death: exposure to chemicals, infection, and a combination thereof. The WCJ concluded further that since there was no possible basis for finding nonoccupational exposure to chemicals, Doctor Silipo correctly opined that decedent's work environment was the most likely cause of the liver disease resulting in death; and thus, Doctor Silipo's opinion is not based on speculation, but on a thorough examination of possible options, and therefore, was substantial evidence to support the finding of industrial causation.

The WCJ also considered historical inaccuracies in Doctor Silipo's report, especially as to Doctor Silipo's assumption that decedent worked around open sewer lines the entire week before his death. Although noting that such assumption was clearly inconsistent with the testimony that the leach line work was a "very clean job," the WCJ nevertheless concluded that in view of the decedent's overall job duties and the dirth of possibilities of nonindustrial exposure, Doctor Silipo's conclusions seemed the most reasonable. The WCJ stated further that he agreed with Doctor Silipo that chemical exposure on the job was the most likely cause of decedent's liver disease which was the principal cause of his death; and therefore, the incorrect history regarding exposure to infectious agents did not negate Doctor Silipo's opinion regarding industrial causation.

The board granted reconsideration, determined that applicants did not meet the burden of proving industrial causation, rescinded the WCJ's findings, and found no industrial causation. In its opinion on reconsideration, the board set forth excerpts from the death certificate, the autopsy report, and the reports of Drs. Silipo and O'Neill, and then concluded: "Based on our review of the record, including the foregoing, we are persuaded that applicant has not met the burden of establishing that decedent sustained an injury arising out of and occurring in the course of employment which resulted in his death on August 31, 1982. The death is unexplained. There is no evidence of decedent's being exposed to any large amount of chemicals that would cause this kind of liver damage and death. Moreover, this record does not establish exposure to an infecting agent during the relevant period. Accordingly, reconsideration will be granted to find that decedent's death is not compensable."

■ Applicants had the initial burden of proving by a preponderance of the evidence that Mr. Wehr's death arose out of his employment. (Lab. Code, § 3202.5; *California State Polytechnic University* v. *Workers' Comp. Appeals Bd.* (1982) 127 Cal.App.3d 514, 520 [179 Cal.Rptr. 605]; *O'Hare* v. *Industrial Acc. Com.* (1941) 44 Cal.App.2d 629, 633 [112 P.2d 915].) "'Preponderance of the evidence' means such evidence as, when weighed

with that opposed to it, has more convincing force and the greater probability of truth." (Lab. Code, § 3202.5.) "When weighing the evidence, the test is not the relative number of witnesses, but the relative convincing force of the evidence." (*Ibid.*)

Contrary to applicant's contention, the section 3202 rule of liberal construction in favor of the employee does not apply to the burden of proof required by section 3202.5. The Legislature expressly provided that "Nothing contained in Section 3202 shall be construed as relieving a party from meeting the evidentiary burden of proof by a preponderance of the evidence." (Lab. Code, § 3202.5.)

Even assuming, as asserted by applicants, that the burden of proof eases or shifts in cases involving death of an employee in mysterious circumstances (*California State Polytechnic University* v. *Workers' Comp. Appeals Bd.*, *supra*, 127 Cal.App.3d at pp. 517-519; see *Haft* v. *Lone Palm Hotel* (1970) 3 Cal.3d 756 [91 Cal.Rptr. 745, 478 P.2d 465]; *Donovan* v. *Workers' Comp. Appeals Bd.* (1982) 138 Cal.App.3d 323 [187 Cal.Rptr. 869]), it was incumbent on applicant to at least produce prima facie evidence that Mr. Wehr's death arose out of his employment.

■ · Here, as the board concluded in determining that applicants failed to meet their burden of proof, there was simply no evidence of the cause of death itself, let alone evidence that the death was industrially related. All of the medical evidence, including the autopsy report, the amended death certificate, and the reports of both physicians, established that the cause of death was unknown and undetermined. Even Doctor Silipo conceded that the cause of death was unknown, undetermined, and problematical. Of the "possible" causes of death suggested by Doctor Silipo, one was based on `Doctor Silipo's incorrect assumption that Mr. Wehr had been exposed to infectious bacteria in the last week of his employment. As to the other suggested possibility, chemical exposure, there was no evidence that the products Mr. Wehr was exposed to contained the chemicals that could cause "Hepatic Effects." Moreover, when weighed with that opposed to it, Doctor Silipo's speculative opinion clearly lacked convincing force and probability of truth. (Lab. Code, § 3202.5.) The board did not err in determining that applicants did not meet their burden of proving industrial causation of Mr. Wehr's death.

Even if it were assumed that applicants met their burden of proof under an easing or shifting theory, the board's finding of no industrial causation is supported by substantial evidence. ■ The board, as ultimate trier of fact, clearly had the power to resolve conflicts in the evidence, make its own credibility determinations, and upon reconsideration to reject the

WCJ's finding of industrial causation. (*Garza* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 317 [90 Cal.Rptr. 355, 475 P.2d 451].) Granted that in making its own findings the board should resolve all reasonable doubts in favor of the employee in accordance with the section 3202 rule of liberal construction (*ibid.*), section 3202 "authorizes neither the creation of nonexistent evidence nor the creation of a conflict in the evidence which does not otherwise exist." (*Sully-Miller Contracting Co.* v. *Workers' Comp. Appeals Bd.* (1980) 107 Cal.App.3d 916, 926 [166 Cal.Rptr. 111].)

 Viewed in the light of the entire record (*Lamb* v. *Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 274, 280-281 [113 Cal.Rptr. 162, 520 P.2d 978]; *Garza* v. *Workmen's Comp. App. Bd.*, *supra,* 3 Cal.3d at p. 317), substantial evidence supports the board's finding that Mr. Wehr did not sustain industrial injury resulting in his death.

The board's order denying reconsideration is affirmed.

Stone, P. J., and Gilbert, J., concurred.

A petition for a rehearing was denied April 2, 1985, and petitioners' application for review by the Supreme Court was denied May 30, 1985. Bird, C. J., was of the opinion that the application should be granted.