[No. E037314. Fourth Dist., Div. Two. Dec. 16, 2005.]

FLEETWOOD ENTERPRISES, INC., Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and JOHN MOODY,
Respondents.

**COUNSEL**

Law Offices of Don Featherstone, Don Featherstone and Michael Pantig for Petitioner.

No appearance for Respondent Workers' Compensation Appeals Board.

Rose, Klein & Marias and Scott M. Rubel for Respondent John Moody.

OPINION

**RICHLI, P. J.**—Following the completion of the expressly "business" portion of a trip to Europe, John Moody (applicant), accompanied by his wife, extended their stay for additional sightseeing in Italy. While driving from Rome towards Düsseldorf, Germany, where the rental car was to be returned and the homeward flight boarded, the Moodys were involved in an automobile accident. Applicant suffered severe injuries. We are asked to determine whether, on the particular facts of this case, applicant's injuries either arose out of his employment or were suffered in the course of his employment. We conclude that they did not and that applicant's employer, Fleetwood Enterprises, Inc., is not obliged to provide workers' compensation benefits with respect to the accident. We also conclude that the Workers' Compensation Appeals Board (Board) erred in ruling that the presumption of compensability established by Labor Code section 5402[1] applies in this case.[2]

## STATEMENT OF FACTS

Fleetwood manufactures recreational vehicles (RV's). Applicant was employed by Fleetwood as a design manager, and at the time of the accident had worked for Fleetwood for about 30 years. In the fall of 1999, along with two other Fleetwood employees, applicant was assigned to attend a major RV show in Düsseldorf. Following the show, they were to visit a German RV manufacturer, and then go on to Italy to meet with a fiberglass supplier.

At the Düsseldorf airport, applicant picked up the rental car, which had been arranged by Fleetwood. The car had to be returned to Düsseldorf.

After obtaining Fleetwood's permission, applicant had arranged to have his wife meet him in Geneva after the RV show and the visit to the German manufacturer. Fleetwood's travel office handled Mrs. Moody's arrangements as well as those for its employees. After applicant drove to Geneva to pick up his wife (the others remained in a small town for the day), the Moodys, the other Fleetwood employees, and their German guide traveled to Italy for the next meeting in the city of Ferrara. This visit involved not only a plant tour but also socializing with the local manufacturer's representatives and sightseeing in and near Ferrara.

---

[1] That section provides that "[i]f liability is not rejected within 90 days after the date the claim form is filed under Section 5401, the injury shall be presumed compensable . . . . The presumption . . . is rebuttable only by evidence discovered subsequent to the 90-day period."

[2] All subsequent statutory references are to the Labor Code unless otherwise stated.

When the business in Ferrara was complete, applicant's coworkers returned to the United States, leaving from Milan, Italy. Applicant and his wife, however, remained in Italy with the rental car. They traveled to Florence and Rome, staying overnight in each city (two nights in Rome), before heading north towards Germany and Düsseldorf.[3] At the time, there were three days before their return flight, and the Moodys had no specific itinerary but intended a rambling route as the fancy took them. However, both were in fact tired of travel and testified that they would have liked to leave from Rome right then if the vehicle had not been due in Düsseldorf.

The accident occurred about 3:00 in the afternoon after they left Rome. Their vehicle was struck by a car that had crossed the center line of the roadway.

In an attempt to establish that he was still performing job duties at the time of the accident, applicant testified that his job as design manager required him to be familiar with all updates and innovations from other RV manufacturers. Although the primary method for obtaining information about competitors was to attend trade shows, he also routinely kept an eye open for RV's made by others, both on the road and at campgrounds, often speaking with the owners to determine which features they liked or disliked. He continued this practice during the subject trip to Europe, photographing "unusual" European RV's during the post-business or vacation portion of the trip. He was particularly interested in finding examples of a "seats-on-top" feature that European manufacturers had recently brought out, and in seeing how European manufacturers coped with the smaller dimensions practical in European cities and on European roads. Mrs. Moody confirmed that when they traveled, they looked not only at other RV's, but at any "artistic design" they thought might be adaptable for use in an RV.

During the trip, applicant used an American Express card in his name, but which was actually a Fleetwood business card. As a rule, when he used the card both for business and personal reasons, he was responsible for the personal charges. However, Fleetwood apparently paid all the charges for the subject trip and did not ask applicant to reimburse it for his post-business expenses.

---

[3] From the map included in the record, and from other sources of which we may take judicial notice (Evid. Code, § 452, subd. (h)), it can be seen that the Moodys' journey involved travel of over 400 kilometers (about 250 miles) in a generally southerly direction from Ferrara to Rome. The journey took them almost directly away from Düsseldorf.

After the accident, Fleetwood took charge of applicant's medical care and expenses, sending an Italian-speaking employee to Italy to assist and eventually chartering an air ambulance to expedite his return. These expenses were primarily funded through Fleetwood's group health program rather than workers' compensation, although Fleetwood apparently directly paid some of the extraordinary expenses and care upgrades. During the critical period, Fleetwood's representatives repeatedly assured applicant and Mrs. Moody that they would be taken care of and that whatever they needed would be provided.

The accident occurred on October 8, 1999. Applicant returned to work in April of 2000 but was laid off in November of 2002. He had not prepared a workers' compensation claim form until May of 2002. Fleetwood denied the claim by letter dated August 1, 2002.

## DISCUSSION

### A.

The petition initially presented a potentially troublesome question concerning section 5402. Respondent Board[4] was persuaded that because 1) Fleetwood had immediate knowledge that the injury might be work related, and 2) it was undisputed that Fleetwood did not give applicant the required claim form and information at any time prior to the filing of the actual claim (§ 5401), then 3) the 90-day period for denial set out in section 5402 actually began to run shortly after the accident. Under this analysis, of course, Fleetwood obviously failed to deny the claim in a "timely" manner, and the presumption would apply.[5]

However, shortly after the petition was filed, the Supreme Court decided *Honeywell v. Workers' Comp. Appeals Bd.* (2005) 35 Cal.4th 24, 29 [24 Cal.Rptr.3d 179, 105 P.3d 544] (*Honeywell*), in which it held that the employer's duty to notify the employee that his or her claim is rejected *only* arises when the employee actually files a formal claim. The court explained that although the employer's knowledge of an industrial injury makes it

---

[4] In its order denying reconsideration, the Board adopted the reasoning of the workers' compensation judge (WCJ) without further comment.

[5] The Board implicitly believed that the undisputed factual circumstances of the accident made it "reasonably certain" that there was an *industrial* injury and therefore obliged Fleetwood to deny any potential claim. (See *Wagner v. Allied Signal Aerospace* (2001) 66 Cal.Comp.Cases 483, 488–489.) The authority discussed *post* makes it unnecessary for us to decide whether the "reasonably certain" standard was correctly applied.

unnecessary for the employee to provide prompt notice (§§ 5400, 5402, subd. (a)), and *does* trigger the employer's duty to provide information, the plain language of section 5402 compels the conclusion that the employer has no duty to reject a claim until it is actually filed.

Applicant attempts belatedly to fit this case under the sole exception recognized in *Honeywell*—estoppel. The Supreme Court stated that if the employer is aware of an industrial injury (see fn. 5), and either refuses to provide a claim form or leads the employee to believe no claim is necessary, the 90-day period may begin before the claim is actually filed *if* the employee "suffered some loss of benefits or setback as to the claim." (*Honeywell, supra*, 35 Cal.4th at p. 37.) However, on the record before us we reject the contention.[6] The WCJ and the Board expressly did not determine whether the facts would support a finding of estoppel as suggested in the Court of Appeal decision in *Honeywell*.[7] It is particularly noteworthy that the WCJ was unsure whether the element of detrimental reliance would be required (as we know, post-*Honeywell*, that it is) and made no attempt to analyze the record in this respect. Hence, we will be obliged to remand the case to the Board for further proceedings on this issue; however, under *Honeywell*, there will be no presumption of compensability unless applicant can establish all of the elements of an estoppel as set out in that case.[8]

### B.

However, the WCJ found, and the Board agreed, that even if the presumption of section 5402 did not apply, applicant had met his burden of proving that the injury was compensable. We disagree.

---

[6] The workers' compensation judge found the witnesses credible who testified that various Fleetwood representatives made comments indicating that they believed the injury was work related. However, it is clear that the medical care was paid either by Fleetwood's company health insurance carrier, or by Fleetwood itself. (We have not found in the record any explanation of what type of salary benefits, disability, or sick leave was paid to applicant during the period he was off work.) The opinions of Fleetwood's personnel are irrelevant except as to any question of detrimental reliance by applicant on the belief that Fleetwood was accepting a workers' compensation claim.

[7] The Court of Appeal had reached the same conclusion as the Supreme Court subsequently did on review.

[8] We do note that applicant argues that he detrimentally relied on a supposedly induced belief that he need not file a claim because "his claim would have been presumed compensable years ago had he been provided and filed his claim form when the employer first had notice of the injury." But this assumes that Fleetwood would not have responded by denying a formal claim, but would have ignored it and thus triggered the damaging presumption. No basis for such an assumption appears in the record.

In considering the finding of compensability, we are mindful of the rule that the workers' compensation laws are to "be liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment." (§ 3202.) Reasonable doubts as to whether an injury occurred in the course and scope of employment should be resolved in favor of the employee. (*Department of Rehabilitation v. Workers' Comp. Appeals Bd.* (2003) 30 Cal.4th 1281, 1290 [135 Cal.Rptr.2d 665, 70 P.3d 1076].) However, these principles do not relieve the claimant of the burden of establishing the relevant facts by a preponderance of the evidence. (§ 3202.5; *Wehr v. Workers' Comp. Appeals Bd.* (1985) 165 Cal.App.3d 188, 193–194 [211 Cal.Rptr. 321].)

■ To begin with, as briefly noted above (see fn. 6), we essentially disregard all evidence of what Fleetwood's representatives said concerning the accident. Fleetwood appears to have acted with commendable concern and even generosity in assisting the Moodys. However, statements or assumptions by Fleetwood employees not shown to have been fully acquainted with the facts (and certainly lacking in expertise with respect to the underlying legal principles) are of only minimal relevance and are not binding on Fleetwood. If an employer *denies* compensability, obviously the denial has no probative value. By the same token, the fact that an employer initially believes that an injury is compensable is not evidence of compensability unless the employer is in full possession of the facts and is competent to apply the governing law to those facts.[9]

We turn therefore to the facts and circumstances surrounding the accident. We conclude that the evidence is susceptible *only* of the conclusion, fatal to applicant, that there was no continuing or resumed business purpose at the time of the accident; further, that no other factor justifies imposing liability for benefits upon Fleetwood.[10]

---

[9] Note that we are not here dealing with a situation in which an employer, for equitable reasons, might be estopped to change its position after appearing to accept liability. Nor is this a case in which an employer representative with personal knowledge of critical facts changes his position after expressing an opinion. For example, if an employer actually present when an employee was injured promptly offered benefits, this would tend to support the employee's assertion that he was performing work duties if the employer later claimed the injury occurred during noncompensable "horseplay." Here, however, the critical facts are really not disputed and the "course of employment" issue is one of law.

[10] It has occurred to this court that the emphasis on whether or not applicant was in the process of returning the vehicle at the time of the accident may have been misplaced. As we explain, applicant's Italian travels were not conducted in the scope of his employment but as a private traveler for pleasure. Fleetwood's agreement that he could use the rental car had nothing to do with his employment. Suppose that a carless employee wishes to borrow a company car to attend some weekend festivity. The employer agrees but requires him to return the car to company premises. If the employee is injured on the drive back on Monday, is the employer liable for workers' compensation benefits? We would say "No," because the

■ As applicant argues, it is well-established that an employer's liability extends beyond the normal workplace. For example, there is no question that if applicant had been injured on the road between Düsseldorf and Ferrara, the injury would have been compensable, because a "commercial traveler" is covered at all times during a business trip. (See *Wiseman v. Industrial Acc. Com.* (1956) 46 Cal.2d 570, 572 [297 P.2d 649] (*Wiseman*).)[11] Next, although the general rule is that an injury is not considered to have been suffered in the "course and scope of employment" while the employee is en route to or from work (see e.g., *Santa Rosa Junior College v. Workers' Comp. Appeals Bd.* (1985) 40 Cal.3d 345, 351–352 [220 Cal.Rptr. 94, 708 P.2d 673]; 2 Witkin, Summary of Cal. Law (9th ed. 1987) Workers' Compensation, § 192, pp. 754–755), an exception is recognized where the employee is on a "special mission" for the employer. This simply means that if the employee's commute also includes some act benefiting the employer, any injury is compensable. Thus, in *Green v. Workers' Comp. Appeals Bd.* (1986) 187 Cal.App.3d 1419, 1422 [232 Cal.Rptr. 465], an employee was told that he would be attending a trade show after his normal work hours and had to go home to obtain suitable clothing; *held*, an injury suffered on the way home was compensable. Finally, if a commuting employee uses a method of transportation that benefits the employer by facilitating the employee's work, an injury during the commute may be compensable. (*County of Tulare v. Workers' Comp. Appeals Bd.* (1985) 170 Cal.App.3d 1247, 1253 [216 Cal.Rptr. 885].) Applicant relies on all of these theories in several variations.

---

agreement that the employee could borrow the car was utterly unrelated to the fact of his employment. So it is here. Fleetwood might just as well have allowed Manfred, their German connection, to use the car so long as it was returned to Düsseldorf.

We realize that the "dual capacity" doctrine has been largely abrogated by statute. (§ 3602, subd. (d); see *Ashdown v. Ameron Internat. Corp.* (2000) 83 Cal.App.4th 868, 874–875 [100 Cal.Rptr.2d 20].) This doctrine allowed an employee to sue for damages—that is, avoid the "exclusive remedy" rule—if the employer stood in some "conceptually distinct" relationship to the employee with respect to the injury-causing mechanism. However, the doctrine only applied in the first place if the employee's injury was *also compensable* under workers' compensation. (§ 3602, subd. (a); § 3600.) Thus, if applicant had "rented" a car from Fleetwood to drive while attending an RV trade show, he would now be limited to workers' compensation damages if he were injured due to a defect in the vehicle. As there was no mutual intent that applicant would be performing job duties on his Italian journey, there is no bar to considering that Fleetwood, in "lending" him the car, was not acting as his employer at all.

Under this analysis, the obligation to return the car to Düsseldorf was simply not one entered into by an employee to the benefit of his employer.

However, as this was not the theory of the case in the briefing or argument, we do not rely on it. (See Gov. Code, § 68081.)

[11] In *Wiseman*, a banker on a business trip to New York died in a fire in his hotel room, where he had been drinking and smoking with a woman "registered as his wife." One imagines that the real widow filed for benefits with mixed emotions.

The most critical issue is whether applicant was still on a "special mission" for his employer at the time of the accident. The WCJ was persuaded by the testimony from applicant and his wife concerning their continuing interest and vigilance with respect to RV designs and elements that might be of use to Fleetwood. We will accept this testimony as true, because the WCJ and the Board are the sole judges of credibility (*Western Growers Ins. Co. v. Workers' Comp. Appeals Bd.* (1993) 16 Cal.App.4th 227, 233 [20 Cal.Rptr.2d 26]); and on issues relating to factual findings, our review is limited to a search of the record for substantial evidence in support of the findings. (§ 5952, subd. (d).) Nevertheless, these facts do not support a finding of compensability.

There is *no* evidence that Fleetwood expected or required applicant to continue photographing RV's in between admiring Michelangelo's David and the Coliseum. The fact that Fleetwood was aware of his plans and facilitated his travel arrangements is immaterial in the absence of evidence that it did so because it expected applicant to function as an employee during that portion of his trip or that it exercised any control over his route.

▮ Applicant asserts vigorously that, as a senior management employee, he was expected to be ever-vigilant concerning competitors and potential innovations. It is true that, in a somewhat analogous situation, an employee injured while participating in specific recreational or social activities is eligible for workers' compensation benefits if he or she can show that the activity was a "reasonable expectancy" of, or "impliedly required by," the employment. (§ 3600, subd. (a)(9).) However, although it is commendable for an employee to keep his employer's business in mind at all times, such a unilateral devotion to duty cannot be permitted to expand the employer's liability for workers' compensation to a "24/7" basis. We decline to extend the concept of "course of employment" to cover applicant's every waking hour. Accepting the fact that applicant looked at RV's during his Italian holiday, this did not transform his personal vacation into a business trip. Although a trip which has components of both business and pleasure may give rise to a compensable injury, the business element must be integral to the trip. The fact than an employee performs "some tidbit of work" during a personal trip will not transform the journey into part of the "course of employment." (*Bramall v. Workers' Comp. Appeals Bd.* (1978) 78 Cal.App.3d 151, 158 [144 Cal.Rptr. 105] (*Bramall*).)[12]

---

[12] At oral argument, counsel for applicant criticized our quotation of *Bramall*, arguing that the reference to "tidbit of work" was inappropriate. We recognize—as did the court in *Bramall*—that " 'where the employee is combining his own business with that of his employer, or attending to both at substantially the same time, no nice inquiry will be made as to which business he was actually engaged in at the time of injury, unless it clearly appears that neither directly [n]or indirectly could he have been serving his employer.' [Citation.]" (*Bramall, supra,* 78 Cal.App.3d at p. 157.) *Bramall* further noted that the "dominant purpose" test for

In this case, applicant's occasional sighting of an interesting RV was clearly no more than a "tidbit" compared to several days of sightseeing. Although, as a conscientious employee, he may have always kept an eye open for useful ideas, it was not the purpose of his trip from Ferrara to Florence to Rome. We think it can be assumed that many employees—especially "white-collar" employees—give occasional thought to their employers' business, but such attention does not mean that they are "at work" at such times. Applicant, for example, may well have thought out design possibilities while at home, or while jogging, or while out for a Sunday drive, but Fleetwood would have not been liable to pay workers' compensation benefits if he had slipped in his hallway, suffered a heart attack on the track, or been involved in a collision. A unilateral, sporadic consideration of the employer's business, at times and locations that cannot be regulated or supervised by the employer, does not expand the course of employment.

This conclusion is consistent with existing case law. In *Garzoli v. Workmen's Comp. App. Bd.* (1970) 2 Cal.3d 502, 506 [86 Cal.Rptr. 1, 467 P.2d 833] (*Garzoli*), the court held that a police officer who was effectively required to wear his uniform while commuting to work, *and* was expected by his superiors to render aid or assistance when necessary, was " 'in the course of [his] employment' " (*id.*, at p. 505) during the commute. Significantly, the court observed that the fact that the officer was "on call" 24 hours a day was *not* sufficient to nullify the "going and coming" rule; critical was the fact that he was visibly in uniform at the time of the accident and thus realistically subject to being expected to act like a police officer if necessary. (*Id.* at p. 504, 505.) The result in *Garzoli* was distinguished on this basis in *State Lottery Com. v. Workers' Comp. Appeals Bd.* (1996) 50 Cal.App.4th 311,

---

compensability had virtually been abandoned. *Bramall* was a "coming and going" case, and the court simply commented that the general rule that injuries suffered in the course of a normal commute are not compensable is not overcome merely because the employee performs "some tidbit of work" at home. We believe that the phrase also accurately states the rule applicable where an employee incorporates some trivial work-related activity into a personal journey. If nothing else, the felicity of the phrase justifies its inclusion.

We also note that the case cited in this context by applicant is not controlling. In *Price v. Workers' Comp. Appeals Bd.* (1984) 37 Cal.3d 559 [209 Cal.Rptr. 674, 693 P.2d 254] (*Price*), the employee commonly arrived at work early, and the doors were frequently open so that he could, in fact, begin work early. On the date of injury the doors were locked, and he was compelled to remain with his car on the street. While waiting, he decided to add oil to the engine, and while doing so was struck by a passing vehicle. The Supreme Court found that, because there was no dedicated parking area, the worker was "within the 'zone of employment' " (*id.* at p. 567); that his early arrival conferred an affirmative benefit on the employer (*ibid.*); and that, given the fact that he had nothing else to do while he waited, adding oil was an act " ' "reasonably contemplated by the employment." ' " (*Id.* at p. 568.) None of these theories directly applies to this case.

318–319 [57 Cal.Rptr.2d 745], in which the court declined to find an off-duty injury to be compensable merely because the employee was "on call" at all times.

In accordance with this approach, we reject the contention that applicant's occasional focus on job-related elements resulted in a constant "course of employment."[13] We are also compelled to note—intending no reference to the current case—that the rule for which applicant argues is simply unacceptably rich in opportunities for fraud. Unlike the situation in *Garzoli*, there would be no objective, verifiable indications of the employee's availability to participate in work activities let alone his actual performance of such activities. Any injured employee would be highly motivated to claim that at the time of the injury, he was actually pondering some work-related issue. The few valid claims under such a rule would be swamped in a flood of fraudulence, inevitably tending to discredit the entire workers' compensation system. If such a rule is to be made, we will not be the ones to make it.[14]

Applicant then cites the rule that injuries incurred during a business trip may be compensable even if the employee has deviated substantially from the expected route. Thus, in *IBM Corp. v. Workers' Comp. Appeals Bd.* (1978) 77 Cal.App.3d 279 [142 Cal.Rptr. 543] (*IBM Corp.*), a California employee attending a 10-day training session in Chicago was killed while returning to Chicago from a weekend visit to relatives living 60 miles away. No training sessions took place over the weekend, but the employee was paid a per diem and obviously as a practical matter had to remain in the area. Upholding the award in favor of the employee's family, the court noted that the employer must have expected some form of "leisure time activity" on the part of the employee, and noted dryly that the family visit was "certainly no more a departure . . . than was the banker's leisure time activity in *Wiseman* [see footnote 9]." (*IBM Corp., supra*, 77 Cal.App.3d at p. 283.) The employee was obliged to remain in the Chicago area during the weekend, and he could hardly have been expected to remain holed up in his hotel room. (Indeed, as *Wiseman* demonstrates, even that would not necessarily preserve him from injury.) Thus, the employer's liability was properly extended to cover the injury.

---

[13] We caution that we are not presented with facts showing that applicant was injured, for example, while actually inspecting a foreign RV in Florence or Rome.

[14] It is also to be noted that such an approach would clearly favor "white-collar" workers over their "blue-collar" brethren, as the duties of the latter less frequently involve intellectual functions, which theoretically could be performed anywhere, at any time.

However, this begs the question of whether the business trip was *over* in this case. We agree that if applicant had been injured during a sightseeing stop between Düsseldorf and Ferrara, the injury might well have been compensable; but that is not this case.[15] Here, the business trip ended in Ferrara. *IBM Corp.* is not controlling.

The next argument to be addressed is based on the principle, stated above, that when an employee uses a mode of transportation advantageous to the employer, even a true commute may give rise to a compensable injury. The reasoning is that because driving the car was beneficial to the accomplishment of the business purpose, applicant's injury should be compensable.[16] Again, we find the crucial issue to be whether the business purpose continued, or even re-emerged, through the time of the accident.

In this respect applicant's strongest argument would be that he was required to return the car to Düsseldorf and thus had a business purpose in driving north from Rome. The argument has some appeal, but we reject it.[17] For one thing, it would be equally arguable that the *entire* trip after applicant left Ferrara was a journey back to Germany and the required return of the car, and this would again impermissibly turn the entire vacation extension into a purportedly integral part of the business trip.[18] Furthermore, we decline to characterize applicant as a reluctant caretaker of the car when its availability was an obvious convenience to him. Although there is substantial evidence that the car did have to be returned in Germany, and that this was the

---

[15] Applicant also cites *Trans World Airlines v. Workers' Comp. Appeals Bd.* (2002) 67 Cal.Comp.Cases 1386, in which a flight attendant was injured visiting a "cave park" during a 36-hour layover. The park was apparently listed by the employer as an available nearby attraction, and the Board held that the worker's visit to the park was an "expected" leisure activity during the layover. Once again the distinction is that here, the "business purpose" of the trip was not merely *interrupted*, it was *concluded.*

[16] Applicant argues for the application of an even stronger version of this rule that imposes liability if the employer *furnishes* the transportation. (See *Zenith Nat. Ins. Co. v. Workmen's Comp. App. Bd.* (1967) 66 Cal.2d 944, 947 [59 Cal.Rptr. 622, 428 P.2d 606].) However, because our crucial finding is that the "special errand" had terminated and applicant was "on his own" at the time of the accident, the fact that the vehicle was rented in Fleetwood's name is not controlling.

[17] At oral argument, Fleetwood conceded that if the accident had occurred on the airport grounds in Düsseldorf, the injury would have been compensable on the basis that any "deviation" from his employer's business had terminated. We do not reach this issue, and we stress that our decision extends only to the facts of this case.

[18] Although the Moodys had no specific itinerary for the return from Rome to Düsseldorf, they did intend to visit friends in Germany and this supports the conclusion that their personal interests remained paramount at the time of the accident.

arrangement made by Fleetwood *before* the group arrived, there is no evidence that this arrangement was for the particular benefit of Fleetwood. Given the difficulty of renting a car in Germany for a journey into Italy, it might well have seemed more reasonable for the Fleetwood group, after their stops in Germany, simply to have flown into Italy and rented a new car there.[19] Or, the three Fleetwood representatives could have all traveled in the car of Manfred; indeed, after applicant's wife joined the group, at times all *five* went in Manfred's car, albeit without luggage.[20]

What *is* apparent is that the arrangement was definitely to applicant's advantage. Having a car in which to drive south from Germany to Italy allowed him to pick up his wife at a Swiss airport, not to mention the convenience of having the car "ready to go" when the other Fleetwood representatives and Manfred headed for their respective homes. And despite the testimony from applicant and his wife to the effect that they would have preferred to leave from Rome, there is *no* evidence that there was any concern about the Düsseldorf departure at the time arrangements were made. The only pertinent evidence suggests that this was quite satisfactory to applicant because, as noted above, they had friends in Germany who could be visited on the way back.[21] Furthermore, although there was some evidence that Fleetwood would expect applicant to pay for his use of the car, he told his wife that the arrangements ensured that "We won't have to pay for a car." The fact (if it be a fact) that the arrangements later became irksome to him does not mean that a matter of mutual convenience was transformed into a burden imposed by Fleetwood.[22]

---

[19] The journey from Germany involved passing through Switzerland and one or more nights on the road with no apparent business purpose. This leisurely itinerary did, however, serve to allow applicant to travel to Geneva to pick up his wife while his companions apparently pursued other interests during the day.

[20] But Manfred did later drive the other two Fleetwood representatives to the airport (probably Milan), with their luggage and, presumably, his own; it is reasonable to suppose that applicant and his bag could also have been transported.

[21] We also note that, in an obvious effort to make the Italy trip seem like a "chore," Mrs. Moody testified that she didn't really want to go to Italy and that she would have preferred to go to Germany. However, she *didn't* go to Germany with applicant, because, as she also testified, she didn't want to be dragged around looking at RV's. Thus, if the Moodys' main wish was to sightsee in Germany, they *had* to drive back from Italy. Again, the return to Düsseldorf can only have become a job "obligation" in retrospect.

[22] While applicant testified that he and his wife would have liked to cut their trip short and return home from Rome, it cannot be assumed that they would have done so but for the need to return the vehicle. There is no evidence that their flight date or departure city could have been changed, or whether the cost of any such change would have been acceptable. Applicant merely testified that he was "not aware" of any restrictions on his ticket.

Another potent factor bearing on the conclusion that the business trip had ended, for workers' compensation purposes, is that applicant's decision to go sightseeing with his wife substantially extended his time on the trip. It does not require a degree in statistics to recognize that if X accidents are likely to occur in a period of Y days, twice as many accidents will occur in 2Y days. Here, Fleetwood legally assumed the obligation that applicant would be involved in an accident some time in a period of Y days. However, applicant's decision to extend his trip also increased the chance that he would be involved in an accident, and that risk is not properly placed on Fleetwood. We find some instruction in the Board case of *Norman v. Workers' Comp. Appeals Bd.* (1997) 62 Cal.Comp.Cases 87 (*Norman*),[23] in which an employee sent to Las Vegas on business turned back due to traffic on her way home, and then was injured when she resumed her journey the next day. In denying benefits, the Board relied both on her choice to use her own vehicle, and her turn-back to Las Vegas, as constituting "substantial deviations" from the employer's purpose. It also noted that in taking these actions, she put herself at a place and time not within the employer's specifications *or* control.

■ *Norman* stands at least for the principle that an employer is entitled to fix the temporal spatial limitations of a business trip, and that an employee who chooses to extend the trip for his or her personal convenience will lose the protection of workers' compensation.[24] In this case, applicant's election to remain in Europe for his own pleasure relieved Fleetwood from any further responsibility for potential misadventures during that portion of the journey.

In a final argument, applicant also claims that the opportunity to visit Italy on his own with his wife was an "inducement" to him to "agree" to make the trip. (See *Trejo v. Maciel* (1966) 239 Cal.App.2d 487, 497 [48 Cal.Rptr. 765] (*Trejo*).)[25] While there is evidence that he found the possibility of additional travel attractive, he cites us to no evidence that he had a realistic option of *refusing* to go at all or that Fleetwood *offered* the opportunity of a personal vacation to persuade him to go. (See also *ante*, fn. 16.) The theory is inapplicable.

---

[23] While cases so reported are not controlling and do not constitute stare decisis, they are citable to show the holding of the Board. The Board's interpretation of statutes it is charged with applying is entitled to respect. (*Ralphs Grocery Co. v. Workers' Comp. Appeals Bd.* (1995) 38 Cal.App.4th 820, 827, at fn. 7 [45 Cal.Rptr.2d 197].)

[24] Insofar as the Board relied upon the fact that, at the time of the accident, the employee was at a *place* that the employer could not control the decision may be inconsistent with *IBM Corp.*

[25] *Trejo* is not a workers' compensation case, but it involves some of the same principles in the context of the employer's respondeat superior liability for the torts of an employee during a journey.

█ In summary, we find that the Board incorrectly determined that applicant was in the course and scope of his employment at the time of the accident. The order awarding benefits is therefore annulled. However, we will remand the matter for further proceedings on the issue of the applicability of section 5402.

Petitioner to recover its costs.

McKinster, J., and King, J., concurred.

The petition of respondent John Moody for review by the Supreme Court was denied February 22, 2006, S140314.